# Lybe's Appeal.

1. An injury caused to a subterranean supply of water by the lawful acts of an owner of land resulting in damage to his neighbor, is *damnum absque injuria*.

2. A. purchased land, subject to a reservation that B. should have the right to conduct the water from a certain spring thereon to his adjoining lands. A. dug a well on his own land, about forty feet from the spring, the effect of which was to cut off the subterranean supply of water to the spring, to the injury of B. Upon a bill in equity, filed by B. against A. to restrain the digging of the well, and compel its filling up:

*Held*, that the bill must be dismissed. The water supply to the spring being under ground and invisible, B. could not claim the absolute right to an uninterrupted flow of water through A.'s land, whereby A.'s lawful use thereof would be prevented.

3. Whenever the subterranean water is so hidden that its course cannot be discovered from the surface, no distinction can be drawn between ordinary percolations, and a subterranean current or stream, and in such case there can be no such thing as a prescription in favor of an adjacent proprietor to have an uninterrupted flow of such water through his neighbor's land.

4. The rights of the respective parties, under the grant and reservation in this case, were in no way different from those of adjoining land owners.

May 20, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

APPEAL from the Court of Common Pleas of *Lancaster county :* In Equity : Of January Term, 1884, No. 388.

This was an appeal by Eli Lybe and Laura M., his wife, and M. B. Eshleman and Annie, his wife, from a decree of said court dismissing a bill in equity filed by them against Rudolph S. Herr, praying for an injunction to restrain the defendant from digging a well on his own land, whereby the subterranean flow of water was cut off from a certain spring upon defendant's land, in which the complainants had an easement to obtain a flow of water through pipes to their land.

An answer was filed, and the cause was referred to an

examiner and master (George Nauman, Esq.) who found the material facts to be as follows:

Peter E. Lightner, father of the complainants, Laura M. Lybe and Annie Eshleman, was in his lifetime seised in fee of two tracts of land situate on opposite sides of the Columbia turnpike. On the tract No. 1, situate on the south side of the turnpike were erected a dwelling house and other buildings. On tract No. 2 was a spring of water with a copious and continuous flow. Mr. Lightner walled up and covered in this spring, and laid pipes therefrom underground to his dwelling house where it was distributed in pipes to a spigot in the kitchen, bath room in second story, hydrant in the yard, spring house, fountain in front yard, and watering trough in the barn yard, at all of which points the flow was abundant— the waste from the watering trough running down through and irrigating his truck patch.

By his will, proved September 30, 1868, Mr. Lightner devised to his four daughters the dwelling house and tract of land No. 1, situate on the south side of the turnpike. In 1874 the title to said entire tract became vested in the complainants, Laura M. Lybe and Annie Eshleman, together with the water privilege hereinafter referred to.

The said testator by his will directed his executors and trustees to sell and convey the tract No. 2, lying north of the turnpike, reserving to the devisees of said tract No. 1, their heirs and assigns, the right to conduct water to their land from the spring in tract No. 2, and to enter upon the said tract No. 2 for the purpose of laying and repairing pipe and keeping the spring in proper condition for the conveyance of the water.

In 1870, the executors and trustees under the will of Peter E. Lightner sold and conveyed to Rudolph S. Herr and his heirs the said tract No. 2 lying north of the turnpike. " Together with all . . . . . water courses . . . . . whatsoever thereunto belonging . . . . . Reserving, by force and virtue of a direction in the said will, the right to the devisees of the tract of land adjoining, No. 1, on the west, their heirs and assigns, to conduct water from the spring on No. 2 to the said premises, and to enter upon the said No. 2 for the purpose of laying and repairing pipes and keeping the spring in proper condition for the conveyance of the water."

On July 22, 1879, Mr. Herr began to dig a well in the field in which the spring was situated, at the distance of about 40 feet from the spring, in a southeasterly direction. After reaching a depth of twelve feet he came to rock, which was blasted to an additional depth of two feet, when an abundant supply of water was obtained. Immediately thereupon the supply of

water at the plaintiffs' house, from the spring, entirely ceased. The plaintiffs then filed this bill, and a preliminary injunction having been granted, the well was partially filled up, but the water has only partially flowed since, in small quantity, to the hydrant in plaintiff's yard, which is their lowest point of supply. The testimony as to the relative levels of the water in the spring, and in the well, and as to the effect of the one upon the other, was very conflicting.

The ·Master reported on this point as follows:—But notwithstanding all this, the Master is satisfied, from a careful examination of all the evidence, and finds as a fact that there is some communication between the well and the spring, that the taking of water from one affects the amount of water in the other; that the digging of the well has materially injured the spring, from which, since the digging, the flow of water has been seriously diminished, to the inconvenience and damage of the plaintiffs. Exactly how this result was produced it is difficult to say. The injury does not seem to have been caused by an interruption of the supply furnished by percolation, for if this were the case, the filling up of the well, even partially, ought to restore the water. The Master believes that the injury has been caused by some damage done to one of the subterranean sources of the spring, by the cutting or diversion of some stream flowing to it in the earth, but, if this be so, the source or stream so damaged, cut, or diverted, was one not perceptible by·the senses, and its existence could not be ascertained by any means in the command of ordinary men.

The Master's opinion upon the law was as follows:—That a serious injury has been done to the plaintiffs is unquestionable, but seems clear that, under the evidence as presented, they can have no redress in this proceeding. The case is one of the almost total destruction of a spring in which they have rights, by the action of the defendant on his own land. It seems, however, to be well settled that the owner of land is not entitled to recover for injuries to wells and springs situated thereon, if caused by the acts of an adjoining owner, if done in the exercise of his lawful rights on his own soil and if such rights are exercised without malice or negligence. The law with regard to surface streams is well established, and while there has been much discussion and some conflict of decision with regard to subterranean waters, the Master is satisfied that the great preponderance of authority supports the doctrine that an injury caused to a subterranean supply of water by the lawful acts of an owner of land is, unless the stream be well defined and its existence known or easily discernible, or unless the injury be caused by negligence or malice, *damnum absque injuria.*

In England the law seems to have been fixed by the decision in Acton *v.* Blundell, 12 M. & W. 336. In that case the plaintiff, Acton, owned a mill which was operated by water flowing from a well dug in his own premises by a former owner of both the mill and the land in which the well was dug. This well the plaintiff had enlarged for the purpose of increasing his supply of water. The defendant subsequently opened and sunk a coal mine on his own land, at a distance of three-quarters of a mile from the plaintiff's well, the effect of which was to cut off the underground veins and currents of water which supplied the plaintiff's well and to prevent his operating his mill. It was held that if the defendant in properly working a mine on his own premises caused a diversion of the water from the plaintiff's well and mill, he would not be liable therefor.

In Pennsylvania the question was first discussed at any length in Wheatley *v.* Baugh, 1 Casey 528. Baugh carried on a tannery upon a piece of ground of about an acre in extent, upon which was a spring which was constantly used in the business. A copper mine having been discovered upon the adjoining farm a shaft was sunk. This shaft being flooded with water, a steam engine was used to pump out the water which interfered with the operations of the miners. Shortly after the engine was started the tan yard spring ceased to flow and remained dry during the running of the engine. When the pumping ceased, the spring resumed its usual flow after an interval of about two weeks. Baugh brought the action to recover damages caused by the loss of the water. He obtained a verdict in the court below, but the judgment was reversed by the Supreme Court on the ground that the evidence showed the spring to have been supplied by percolations only, and that the interruption of these formed no cause of action. The court say, however: "We have treated the spring as depending upon percolations alone at the point where the mining operations were carried on; because the evidence does not show that any distinct watercourse leading to it has been diverted or cut off. If this should be shown and it should also appear that it could have been preserved without material detriment to the owner of the land through which it flowed, the destruction of it might be attributed to malice or negligence."

In Whetstone *v.* Bowser, 5 Casey 59, it was held that where a subterranean flow of water had become so well defined as to constitute a regular and constant stream, the owner of the land above, through which it flowed, had no right to divert or destroy it to the injury of the person below. But the stream in that case was one of those, not uncommon in a limestone

region, which in its course entered a "sink," followed a subterranean channel for some distance and then reappeared upon the surface, its identity throughout being unmistakable.

The question was again discussed in Haldeman *v.* Bruckhart, 9 Wright, 514. Bruckhart was the owner of a tract of about sixteen acres of land, on which there was a large spring of water. Haldeman dug a pit to mine iron ore about three hundred and thirty feet from the spring. This pit was about forty feet deep, and whenever the steam pumps used to drain it were in full operation the spring entirely dried up. When the pumping ceased, the spring recovered its natural flow in about forty-eight hours. The pit was entered by three distinct streams. The action was brought by Bruckhart for destroying or diverting the spring. Under the ruling of the court below, there was a verdict for the plaintiff, but the judgment was reversed by the Supreme Court. The Court says: " A proprietor of land may, in the proper use of his land for mining, quarrying, building, draining, or any other useful purpose, cut off or divert subterranean waters without any responsibility to that neighbor. Some of the grounds for the distinction are clearly pointed out in Acton *v.* Blundell, 12 M. W. 324, and others may be mentioned. . . . . . . These appear to us very sufficient reasons for distinguishing between surface and subterranean streams, and denying to inferior proprietors any right to control the flow of water in unknown subterranean channels upon an adjoiner's land. They are as applicable to unknown sub-surface streams as they are to filtrations and percolations through small interstices. Neither can be defined water courses, though they may be definable. . . . . . . We think, therefore, that the learned judge in the Common Pleas misapprehended what has been ruled in Wheatly *v.* Baugh. The defined water courses there spoken of which a man may not divert to the hurt of an inferior proprietor, are not the hidden streams of which the owner of the soil through which they pass can have no knowledge until they have been discovered by excavations made in the exercise of his rights of property. They are known streams to which, if the lower proprietor has any rights, they are perceptible, and require no sub-surface exploration before their course can be defined. We are not, however, to be understood as intimating that an owner may maliciously or negligently divert even an unknown subterranean stream to the damage of a lower proprietor. But in the enjoyment of his land he may cut drains, or mine, or quarry, though in so doing he interfere with the flowage of water in hidden, unknown underground channels.

Applying these principles to the present case, we are constrained to say we see no evidence of malice or negligence on

the part of the defendants.  Mining on their land as they did, was no more than the exercise of their legal rights.  If in so doing they interrupted an underground stream which supplied the plaintiff's spring, it was *damnum absque injuria*, and there was no evidence of the existence of such a known well-defined watercourse under ground in the land of the defendants as will enable the plaintiff to maintain an action against them' for diverting it by their mining operations and thus destroying the spring.

The same doctrine has been asserted in other states.  In New Albany and Salem R. R. Co. *v.* Peterson, 14 Indiana, 114, it was held that if the owner of land made an excavation within his own premises thereby draining the well of another, the draining being caused by cutting off the underground springs or fountains which supplied the well, no action would lie.

In Greenleaf *v.* Francis, 18 Pick., 117, the plaintiff had dug a well on her own land and drew water therefrom ; the defendant owning the adjoining lot, dug another well on his own ground and within five feet of the plaintiff's well, thereby diminishing her supply of water.  The Court ruled that, in the absence of malice, the injury was not actionable.

In Delhi *v.* Youmans, 50 Barb., 316, the destruction of springs caused by digging upon the defendant's own land was decided to be *damnum absque injuria*, in the absence of malice.

And in the very well considered case of Frazier *v.* Brown, 12 Ohio St., 294, it was held that in the absence of anything arising from either express contract or positive legislation, no action would lie for the destruction, in the exercise of a lawful right, of a spring, caused by destroying the flow of sub-surface waters which, without any distinct, definite and known channel, ooze, filter and percolate in small veins from the lands of one into those of his neighbor.

It was, however, strenuously contended before the Master that the rights of the plaintiffs were stronger from the fact that their claim to the water rested upon a reservation in the deed to Herr—that this reservation imposed a servitude upon his lands, that it imposed upon him the duty, as it were, of allowing the waters in his lands to flow into the spring of the plaintiffs and restrained him from any acts, even upon his own property, which would interfere with the supply.  But it is difficult to see why this should be so.  Surely the rights of the plaintiffs cannot be greater than they would be if they owned the land upon which the spring stands and a strip of ground leading from their own premises to it in which pipes could be laid and by which access to it could be had.  In that case the water would be entirely theirs, but the case would, in the

Master's opinion, be ruled by the principles laid down in the decisions cited.

A somewhat similar question was recently decided in Brain *v.* Marfell, in the High Court of Justice, Court of Appeals, and reported in 20 Amer. Law Register, page 93. In that case, Brain and Marfell being adjoining land owners, the latter sold to the former a well or spring, with the sole right to all the water obtainable therefrom, with the right to lay pipes and conduct the water to his dwelling house, with the right of entry for repairs or other proper purposes, and with the further declaration that the spring or well should be the absolute property of Brain, and with the further covenant that he should use, possess and enjoy it without any interruption or disturbance by Marfell and his assigns. Marfell sold a portion of his land to a railroad company, which made a tunnel through the premises and thereby destroyed the spring. For this injury Brain brought suit against Marfell, relying upon the terms of the agreement. It was held that while the action was perhaps not properly brought, as the company were not the assigns of Marfell, yet admitting that they were, the defendant had not, by conveying the spring in the manner set forth, deprived himself of the right to make improvements on his land, and that the agreement did not prevent him from interfering by means of underground operations with the flow of water before it reached the spring head. Under the grant from Marfell the rights of Brain were certainly greater as against his grantor than the rights of the plaintiffs in this case against Herr.

The rights reserved for the plaintiffs by the executors of Mr. Lightner's will are the rights to conduct water and to enter upon the land for the purpose of laying and repairing pipes and keeping the spring in good order.

It was further argued that the conduct of the defendant showed malice. Malice and negligence must be proved, and while the Master thinks it most unfortunate that the defendant should have selected the spot chosen by him for digging his well, and while it would seem that having a field of thirty acres at his command, he need not have dug so close to the spring of the plaintiff, yet he cannot from this mere fact of proximity, find that the defendant was actuated by malice.

Upon all the facts of the case the Master is of opinion that the bill of the plaintiffs should be dismissed and he so recommends to the court.

The complainants filed the following exceptions, inter alia, to the Master's report:

1. The Master erred in not finding as a fact that the plaintiffs' spring was supplied by a subterranean flow of water so well defined as to constitute a regular and constant stream

flowing from the direction of defendant's well, which stream by the digging of said well was diverted from its former course, to the injury and destruction of the spring.

2. The Master erred in that part of his finding of facts in which he reports as follows: "If this be so, the source or stream so damaged, cut or diverted was one not perceptible by the senses, and its existence could not be ascertained by any means in the command of ordinary men."

3. The Master erred in not finding as a fact that the water in the spring and well stand at the same level.

5. The Master erred in his conclusion of law that under the evidence as presented plaintiffs can have no redress in this proceeding.

6. The Master erred in his conclusion of law as follows, viz: "Surely the rights of the plaintiffs cannot be greater than they would be if they owned the land upon which the spring stands, and a strip of ground leading from their own premises to it, in which pipes could be laid, and by which access to it could be had. In that case the water would be entirely theirs, but the case would, in the Master's opinion, be ruled by the principles laid down in the decisions cited."

7. The Master erred in recommending that the bill of the plaintiffs should be dismissed.

The court, after argument, entered a decree dismissing the exceptions, confirming the Master's report, and dismissing the complainants' bill. The complainants took this appeal, assigning said decree as error.

*S. H. Reynolds* and *D. McMullen*, for the appellants.—In all the cases cited by the Master the contention was between the owners of adjoining lands, and in several of them, as Wheatley *v.* Baugh and Haldeman *v.* Bruckhart, the decision was put expressly on the ground of the absence of any easement or servitude in favor of one lot owner as against the other. The distinguishing feature of this case is that we complain of an injury to an easement expressly reserved out of the grant of the land to the defendant. The Master said he could not see that that made any difference. In this we differ with him. The facts here were proven that Herr purchased his land expressly subject to a well-defined easement described on the face of his deed; he knew distinctly what it was and where it was; that the waters of this spring came from under his land; and he thereby recognized, in the language of the court in Wheatley *v.* Baugh, "the right of the plaintiffs to convert his farm to their own use for the purpose of a filter." He had no right, therefore, to so injure the spring, for his own advantage, as to destroy the easement reserved and rid his property of the servitude.

*D. G. Eshleman* (*J. B. Good* with him), for the appellee.

Mr. Justice GORDON delivered the opinion of the court, October 6, 1884.

In the deed of Peter Lightner's executors to Rudolph S. Herr, the appellee and defendant below, there was nothing reserved but a right, in favor of the devisees of the tract of land adjoining, tract No. 1, on the west, " to conduct water from the spring on No. 2 to the said premises, and to enter upon the said No. 2 for the purpose of laying and repairing pipes, and keeping the spring in proper condition for the conveyance of the water." This is the limitation of the reserved easement, and beyond it there can be no presumption in favor of the grantors. We agree with the learned Master that in this spring of water the plaintiffs, by the reservation, acquired no greater rights than if it had embraced not only the water, but also the ground whence it flowed. In other words, the rights of the contestant parties are those of adjacent land owners, and none other. Such being the case, the proposition is rather startling that Herr cannot be permitted to dig a well in his own land because he may thereby, in some unknown manner, interfere with the flow of the water to the reserved spring.

Than the doctrine of subterranean percolations and water courses no subject has been more fully discussed in our books. We would refer more especially to the cases of Wheatley *v.* Baugh, 1 Ca., 528, and Haldeman *v.* Bruckhart, 9 Wr. 514, in which the matter has been fully considered and disposed of by Justices LOWRIE and STRONG. The latter case also successfully combats the idea advanced by the counsel for the appellants, that a distinction must be made between ordinary percolations and subterranean currents or streams. The rule is, that wherever the stream is so hidden in the earth that its course is not discoverable from the surface, there can be no such thing as a prescription in favor of an adjacent proprietor to have an uninterrupted flow of such stream through the land of his neighbor. One reason given for this conclusion is that, if the former can have such right, he can prevent the latter from the use of the water in his own soil, for a use and return of it, as in the case of surface streams, is impossible. But we need not pursue this subject, for the very able report of the learned Master has relieved us from any such necessity, and we have nothing farther to say except that, with him and the court below, we agree in the propriety of the dismissal of the bill.

> The decree of the Court of Common Pleas is now affirmed, and the appeal dismissed at the costs of the appellants.