Rothrauff et ux., *v.* Sinking Spring Water
Company, Appellant.

Argued May 10, 1940. Before SCHAFFER, C. J.,
MAXEY, DREW, LINN, STERN, BARNES and PATTERSON, JJ.

*Charles W. Matten,* of *Matten & Matten,* with him *Geo. Eves,* for appellant.

*John B. Stevens,* of *Stevens & Lee,* for appellees.

OPINION BY MR. JUSTICE STERN, June 24, 1940:

Plaintiffs are the owners of a farm in Berks County upon which, until the event hereinafter mentioned, there was a deep-seated spring producing a substantial quantity of water. Defendant, a corporation engaged in the business of furnishing water to the public, entered into a written agreement with plaintiffs on January 9, 1935, by which it was to purchase the effluent of this spring for a period of ten years for the price of two and a half cents per thousand gallons, the flow to be metered in such manner that wastage or overflow from its reservoir would not be registered.

Having difficulty with its other sources of supply and finding that the amount of water received from the spring was inadequate for its needs, defendant obtained permission from plaintiffs to sink a well on their property in order to secure an additional quantity to augment the flow of the spring. Such a well, designated No. 1, was drilled, and the parties thereupon signed another agreement, dated May 29, 1936, in which defendant was given permission to install a pump and to connect this well by a pipeline to defendant's collecting basin, the combined flow of the well and spring to be metered through the then existing equipment, or defendant, at its option, might run the water from the well directly into its distribution system through an independent meter to be installed.

Defendant, requiring a still larger supply, with plaintiffs' consent sank three more wells on their land. Of these, two were wholly unsuccessful, and the third was abandoned when it was found that its effect was to muddy the water in the spring. Defendant next drilled a well on its own property some distance below the

spring, but the water there was not potable. Then defendant took options on a property adjoining that of plaintiffs and on it dug three additional wells, none of which gave satisfactory results. During October and November, 1936, defendant drilled another well, designated No. 9, on this same property; this well furnished an abundant supply of water, but immediately upon operating it, at the beginning of December, 1936, plaintiffs' spring went dry, a condition which has since persisted and which the parties apparently agree will be permanent. As far as well No. 1 is concerned, defendant continued to pump water therefrom, under the contract of May 29, 1936, until October, 1937. In June, 1938, the parties entered into a third contract by the terms of which defendant agreed to pay plaintiffs a flat rate of $100 per month for water taken from this well, regardless of quantity, and this contract is still in force and plaintiffs have been paid in accordance with its terms.

The present action was brought by plaintiffs to recover three items. One, of $286.65, was for water taken by defendant from the spring and from well No. 1 during the months of October and November, 1936; liability for this amount was admitted by defendant at the trial and is not in controversy. A second item, of $451.22, was for water taken by defendant from well No. 1 between December, 1936, and October, 1937; no part of this item,—although $363.59 thereof was admitted by defendant in its affidavit of defense to be due, —was included in the verdict obtained by plaintiffs. The third and principal item, of $4,744.81, was for water, at the rate of two and a half cents per thousand gallons, which plaintiffs claim would have been obtained from the spring and delivered to defendant under the contract of January 9, 1935, had defendant not made such delivery impossible by its sinking of well No. 9, the result of which, according to plaintiffs, was the drying up of their spring. The $4,744.81 thus claimed was intended

to represent the value of the estimated flow for the period from December 1, 1936, the time of the stoppage of the spring, until November 1, 1938; the significance of the latter date, or why the claim was thus limited, is not apparent from the record.

The jury returned a verdict in favor of plaintiffs for $4,416.50 being the sum of the items of $286.65 and $4,744.81, less a set-off of $615 admitted by plaintiffs to be due defendant for the cost of drilling well No. 1, for which plaintiffs, in the contract of May 29, 1936, had agreed to reimburse defendant.

It will be noted at the outset that plaintiffs are not proceeding in trespass for the difference in the value of their land before and after the permanent destruction of the spring, but in assumpsit for breach of the contract of January 9, 1935. The suit is founded upon the principle that the prevention by a party to a contract of performance by the other party constitutes an actionable breach: Restatement, Contracts, section 315 (1) ; *Rogers v. Davidson,* 142 Pa. 436, 439; *Arlotte v. National Liberty Insurance Co.,* 312 Pa. 442, 445; *Miles v. Metzger,* 316 Pa. 211, 217. But defendant contends that even if the drilling of well No. 9 did cause plaintiffs' spring to run dry, this was neither the breaking of a contract nor the commission of a tort, because defendant had a legal right to drill the well, and if any damage was caused thereby to plaintiffs it was damnum absque injuria.

More than fifty years ago this court said in *Lybe's Appeal,* 106 Pa. 626, 634: "Than the doctrine of subterranean percolations and water courses no subject has been more fully discussed in our books." And yet, curiously enough, although there have been even more cases on this subject since that decision than before it, the important issue involved in the present litigation is a novel one in this State.

This much is settled,—that when a spring depends for its supply upon filtrations and percolations through the

land of an adjoining owner, and in the use of that land for lawful purposes the spring is destroyed, such owner, in the absence of malice and negligence on his part, is not liable for the damage thus occasioned: *Wheatley v. Baugh,* 25 Pa. 528; *Haldeman v. Bruckhart,* 45 Pa. 514; *Coleman v. Chadwick,* 80 Pa. 81; *Lybe's Appeal,* 106 Pa. 626; *Collins v. Chartiers Valley Gas Co.,* 131 Pa. 143; 139 Pa. 111; *Williams v. Ladaw,* 161 Pa. 283; *Zimmerman v. Union Paving Co.,* 335 Pa. 319. The question now arises in regard to the scope of the limitation embodied in the phrase "in the use of that land for lawful purposes." Such purposes undoubtedly include mining, quarrying, building, draining, cultivating and irrigating the land, as well as watering livestock, and domestic uses in general. Do the same rights exist in the case of an owner who treats subterranean water as merchandise for sale and distribution to persons having no connection with the land from which the water is derived? Under what is known as the English rule,[1] as well as most of the earlier decisions in this country, no distinction was made in this respect, the argument being that subjacent water, like minerals or oil, should belong to the owner of the land absolutely and for all purposes, and that, because of the difficulty of tracing the occult movements of underground waters, and because an attempt to administer any other legal rule would involve the subject in uncertainty, the only practical solution

---

[1] This rule never prevailed in the case of surface streams, it being uniformly held as to them that, while a riparian owner may use the water for purposes incident to the proper enjoyment of his land, he has no right to divert or sell it for use in no way connected therewith: *Scranton Gas & Water Co. v. Delaware, Lackawanna & Western R. R. Co.,* 240 Pa. 604; *Palmer Water Co. v. Lehighton Water Supply Co.,* 280 Pa. 492; *Lackawanna Mills v. Scranton Gas & Water Co.,* 300 Pa. 303. The same is true of subterranean water which, instead of being diffused and percolating, flows in such a well-defined watercourse as to constitute a regular and constant stream: *Whetstone v. Bowser,* 29 Pa. 59; *Brown v. Kistler,* 190 Pa. 499.

is to allow each owner to enjoy full rights of property in the waters under his land. But the marked tendency in American jurisdictions in later years has been away from the doctrine that the owner's right to sub-surface waters is unqualified; on the contrary there has been an ever-increasing acceptance of the viewpoint that their use must be limited to purposes incident to the beneficial enjoyment of the land from which they are obtained, and if their diversion or sale to others away from the land impairs the supply of a spring or well on the property of another, such use is not for a "lawful purpose" within the general rule concerning percolating waters, but constitutes an actionable wrong for which damages are recoverable. While there is some difference of opinion as to what should be regarded as a reasonable use of subterranean waters, the modern decisions are fairly harmonious in holding that a property owner may not concentrate such waters and convey them off his land if the springs or wells of another landowner are thereby damaged or impaired. Among leading cases may be cited: *Forbell v. City of New York*, 164 N. Y. 522, 58 N. E. 644; *Dunbar v. Sweeney*, 230 N. Y. 609, 130 N. E. 913; *Katz v. Walkinshaw*, 141 Cal. 116, 70 P. 663; 74 P. 766; *Erickson v. Crookston Waterworks, Power & of East Orange*, 77 N. J. L. 623, 74 A. 379; *Rouse v. City Light Co.*, 100 Minn. 481, 111 N. W. 391; *Meeker v. City of Kinston*, 188 N. C. 1, 123 S. E. 482. In the absence of precedent in our own State we adopt this view as the proper interpretation of the law, and therefore hold that when defendant sank well No. 9 and used the water therefrom for the purpose of sale and distribution, it committed, as against plaintiffs, a tortious act for which at common law they might have recovered resulting damages, or, there being in existence a contract of which such illegal act constituted a breach by preventing performance on the part of plaintiffs, they may, as already pointed out, recover damages in their present action on the contract.

The factual question, vigorously contested at the trial, was whether the drying up of plaintiffs' spring was actually caused by the sinking of well No. 9. Both parties presented evidence; this issue was for the jury and its verdict is conclusive. As to the measure of damages, this was properly assumed to be the amount which plaintiffs would have obtained under their contract from the sale of the water of the spring had its flow not been destroyed by defendant's act. Plaintiffs were entitled to recover for such water at a valuation of two and a half cents per thousand gallons, and in order to determine the probable quantity lost to the spring by the drilling of well No. 9 it was proper to receive evidence of the amount of flow from the spring before that well was dug. It is true that the damages thus computed are not likely to be wholly accurate, but the law requires only reasonable certainty as distinguished from mere conjecture: Restatement, Contracts, section 331 (1) and illustrations thereunder: *Macan v. Scandinavia Belting Co.*, 264 Pa. 384, 392, 393; *Freedom Oil Works Co. v. Williams*, 302 Pa. 51, 56; *Commonwealth Trust Co. of Pittsburgh v. Hachmeister Lind Co.*, 320 Pa. 233, 239, 240.

Unfortunately, while the proper measure of damages was adopted by the court, there was error in the way in which it was applied to the facts of the case, and the verdict cannot be sustained in the amount rendered. Plaintiffs, having limited their claim to the quantity of water lost to the spring during the twenty-three months from December 1, 1936, to November 1, 1938, chose, as the criterion to establish the likely loss per month during that period, the average number of gallons per month which the spring produced during the year from June, 1935, to May, 1936. All the witnesses, however, including those of plaintiffs, testified, and plaintiffs and their counsel admitted, that the digging of well No. 1 on plaintiffs' land took water away from the spring; indeed it was shown that the flow from the latter fell off sharply

and continuously from the time when well No. 1 was first operated, on or about June 1, 1936, until the final extinction of the spring in the beginning of December, 1936. For any loss of water due to the drilling of well No. 1 defendant is not liable, because that well was sunk by agreement of the parties and plaintiffs are being paid under a separate contract for the water taken from it by defendant. In order, therefore, to ascertain the damage done to the flow of the spring by the operation of well No. 9, the average monthly amount of water previously obtained from the spring must be ascertained, not for the year ending in May, 1936, which was before well No. 1 went into operation, but for the period from June 1 to December 1, 1936, during which time the flow was already greatly reduced by the pumping of that well. The learned trial judge in his charge to the jury in effect told them that the damages, if any, due plaintiffs for loss occurring during the period from December 1, 1936, to November 1, 1938, because of the drilling of well No. 9, amounted to $4,744.81, which was the figure erroneously claimed by plaintiffs, instead of instructing the jury to be guided, in their estimate of that loss, only by the flow of the spring after it had become affected by well No. 1.

Defendant placed in evidence a chart (exhibit No. 10) from which it would seem that the average monthly amount of water received by defendant from the spring, as distinguished from that received from well No. 1, from June 1 to December 1, 1936, can readily be ascertained, especially if supplemented by the records of the actual payments made by defendant during that time after deducting those attributable to the water pumped from well No. 1. The court below should compute therefrom the average monthly amount of water from the spring received by defendant from this six-month period between the time when well No. 1 came into operation and the drilling of well No. 9; the amount thus ascertained, multiplied by twenty-three, will indicate the probable quantity of water of the spring lost to plain-

tiffs for the period for which they have claimed damages in the present action, and that quantity, at the rate of two and a half cents per thousand gallons, will establish the sum to which they are here entitled on this item. To this should be added the items of $286.65, admitted to be due, and $363.59 (if still unpaid), being the part of the item of $451.22 admitted in the affidavit of defense to be due for water taken by defendant from well No. 1 between December, 1936, and October, 1937. There should be deducted the counter-claim of $615. The court should then make an order giving to plaintiffs the option to accept a reduced verdict as thus ascertained or to suffer the granting of a new trial. The acceptance of the latter alternative will enable plaintiffs, if they so desire, to present evidence of their own in regard to the amounts of water received from the spring from June 1 to December 1, 1936, instead of being concluded by the figures in defendant's exhibit No. 10.

The judgment is reversed, and the record is remitted to the court below to proceed as herein directed.