## CITYCO REALTY COMPANY v. ALONZO SLAYSMAN ET AL.

[No. 95, October Term, 1930.]

358

*Decided January 16th, 1931.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*John L. G. Lee* and *T. Lyde Mason, Jr.,* for the appellant.

*Thomas M. Jenifer,* with whom was *H. Courtenay Jenifer* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

The Cityco Realty Company, the appellant in this case, is a corporation engaged in the development and sale of sub-

urban real estate. On December 18th, 1922, it acquired by grant from the Idlewylde Realty Company part of a tract of land lying in Baltimore County, east of the York Road and a short distance north of the northern boundary of Baltimore City, known as Idlewylde, which had been laid out in lots and improved by the opening of streets and avenues designed to afford access to them. The location of these several lots with relation to such streets and avenues and to each other is shown on a plat known as the "Revised plat of Idlewylde." One of the avenues so established is Sherwood Road, which runs in a southerly direction from its intersection with Register Avenue, a public highway running in a general easterly direction from the York Road. On October 6th, 1923, the Idlewylde Realty Company granted to Alonzo Slaysman and Elizabeth B. Slaysman, his wife, two contiguous lots of ground known as lots Nos. 386-B and 386-A Idlewylde, each having a depth of 200 feet, and each having a front of 50 feet on the west side of Sherwood Road. At that time the nearest road intersecting Sherwood Road south of the Slaysman lots was Walter Avenue, some seven or eight hundred feet distant, but on one of the earlier plats of Idlewylde, prepared before the appellant acquired the property, a road known as Banbury Road was shown intersecting Sherwood Road at a point 75 feet south of the Slaysman lots, and running westerly from that intersection. That road, if it was ever used, has been abandoned and no longer exists.

After the appellant acquired the Idlewylde property, it proposed to open, grade, and pave a new road fifty feet wide, abutting on the southern boundary of the Slaysman property, to be known as Overbrook Road, and, in accordance with its policy, it attempted to secure contributions from persons owning land which would abut on the proposed road for aid in defraying the expense of the improvement. With that end in view, the appellant by its president wrote to Alonzo Slaysman, telling him of the proposed improvement, calling his attention to the fact that his property would have a frontage of 200 feet on the proposed road "if we opened it to your

lot," and agreeing to do that if Slaysman would contribute $350 towards the improvement. Slaysman did not answer that letter, but later a lawyer representing him called upon Mr. John J. Hurst, president of the Cityco Realty Company. Negotiations followed, which came to nothing, and, after they ended, the appellant proceeded to open, grade, and improve the road, but, instead of opening it fifty feet wide, as originally proposed, it opened it forty-nine feet wide, so as to leave between it and the Slaysman property a strip of ground one foot wide. Later the appellant granted the road forty-nine feet wide to the county, still leaving between it and the Slaysman lots the one-foot strip of ground, the title to which it retained.

After the road was opened, the Slaysmans, on the rear of their lot, erected a dwelling, a one-story bungalow, facing Overbrook road, which upon its completion was occupied by John H. Slaysman, and he, in connection with his use of the property, from time to time committed a number of petty trespasses and encroachments on the one-foot strip. After repeatedly protesting against such use without avail, on December 31st, 1929, the appellant filed in the Circuit Court for Baltimore County in equity its bill of complaint against the appellees, and subsequently on May 30th, 1929, it filed an amended bill, in which it set out, in substance, the facts stated above, and prayed that the defendants be restrained from passing over or using the one-foot strip of ground. The defendants answered the amended bill, and, in so much of their answer as is relevant or material to any question properly in issue, alleged that they did not know of the existence of the one-foot strip until after they had erected the dwelling on the rear of their lots, that during the construction of that building the appellant "made no protest, nor took any steps to assert its right to the one-foot strip of land, or to prevent" the defendants "from erecting said dwelling," and, because of its failure to assert its claim to the strip until the building was completed, it is now estopped from interfering with the right of the appellees to use it as a part of Overbrook Road. Exceptions to that answer were overruled, the case heard on

bill, answer, and testimony, and on July 17th, 1930, the chancellor dismissed the bill. From that decree this appeal was taken.

The only issue of fact in the case was whether, at the time they erected the dwelling on the rear of their lots, the Slaysmans knew that the appellant had reserved a one-foot strip of land between their land and Overbrook Road.

John J. Hurst, president of the Cityco Realty Company, testified in the most positive terms that they had such knowledge; John H. Slaysman, a son of the owners of the two lots, said he did not learn of the reservation of the strip until the house on the rear of the lots was about half completed, but Mrs. Alonzo Slaysman testified that at some time, which she did not fix, Mr. Hurst told her that "if we didn't pay certain money he would fix us," and that "he seemed very excited and he just told us if we didn't pay something what he was going to do and he went off talking." And, when asked, "Did he say what he was going to do?" she replied, "Something about a foot of ground, but I could not hear what he said." When asked to fix the time of that conversation, she said, "We were living there about six months, I guess." It may be inferred that by "there" she meant the dwelling on the front of the lots, which was erected some time before the construction of the dwelling on the rear of the lots was begun, for it does not appear that she ever lived in the bungalow, but she did live in the building on the front of the lots. If that was true, then she at least knew that the appellant had no intention of letting the appellees benefit by the construction of the new road unless they contributed to the cost of it.

Hurst had made it unpleasantly plain to the appellees that the appellant did not intend that they should have any benefit of the road unless they helped to pay for it; he had repeated conversations with John H. Slaysman, who was employed by the appellant in the construction of that very road, and had urged him to induce his parents to contribute to the expense of building it. Before construction work on the road was begun, he wrote to Alonzo Slaysman: "We wrote you on April 23rd. Will you please let us know by return mail,

whether you are interested in having your lot made a corner or not, as we are about to go ahead. It will be too late after we make the improvements, to change the plans." Later he showed him a plat which he had had prepared showing the Slaysman property as a corner lot, to indicate to him just "what he would get," but Slaysman "did not comply," and "turned the matter over to his lawyer." During the construction of the bungalow, which extended over a period of four or five months, John H. Slaysman, who did much of the work on it himself, was warned by the appellant not to carry material across the strip. All of this testimony strongly corroborates Hurst's statement that the Slaysmans knew before the new road was opened that it would not extend to their property, and the only reasonable inference to be drawn from it is that, when they built the bungalow, they knew perfectly well that their property did not abut on Overbrook Road. There was no possible reason why Hurst, whose object was to induce the appellees to pay part of the expense of opening the new road, should have failed to bring to their attention the most potent argument he could have used to secure their assistance, which was that, unless they did subscribe, the road would not reach their property.

But even if the appellees did not know, until the building was well under way, that the road did not reach their property, it is not apparent how the appellant was estopped from asserting exclusive ownership to the one-foot strip of land, for there is not the slightest proof that it did anything to mislead the appellees, or to induce in them the belief that the road would abut on their property.

The appellees had an unqualified right to erect the bungalow or any other building on their land, so long as the structure did not violate any of the covenants of the deed from the Idlewylde Realty Company to Alonzo and Elizabeth Slaysman, and to have it front in whatever direction they pleased. The appellant had no right to interfere with them in the exercise of that privilege, nor was the fact that the front of the bungalow faced Overbrook Road in itself warning or notice that the Slaysmans claimed any right or access

to that road, for it may well have been that they preferred to have it face an open road rather than the back of the building on the front of the lots.

Before one is justified in expending money in the improvement of his own land in reliance upon some supposed right to use the land of another, it is incumbent upon him first to ascertain that in fact he does have such a right. For, unless the owner of the land claimed to be subject thereto has granted the right by deed, or has by acts *in pais* estopped himself from denying its existence, no such right will be implied. Nor will the fact that the improvement will be useless unless such right exists be in itself sufficient reason for depriving the owner of the land against which such right is asserted of his property. It has long been settled that "one who stands by and sees another laying out money upon property to which he has some claim or title, and does not give notice of it, cannot afterwards, in good conscience, set up such claim or title." *Browne v. M. E. Church,* 37 Md. 124; *Tongue v. Nutwell,* 17 Md. 212; *Carmine v. Bowen,* 104 Md. 203 *et seq.,* 64 A. 932. But that principle has no application where means of knowledge of the true state of the title is equally available to both parties (*Browne v. M. E. Church, supra; Tongue v. Nutwell, supra; Schaidt v. Blaul,* 66 Md. 141, 6 A. 669; *Park Ass'n. v. Shartzer,* 83 Md. 10, 34 A. 536); and "where the act of one is an encroachment on the soil or rights of another, an acknowledged tort, equally well known or equally open to the notice of both parties, it gives no right until it has continued for such length of time" as to ripen into a title by adverse possession. *Tongue v. Nutwell, supra.* Fraud, actual or constructive, in some form, is an essential ingredient of the doctrine of equitable estoppel (10 R. C. L. 688, 21 C. J. 1122), and may take the form of actual misrepresentation by word or act, or silence, when some duty or obligation bids one speak. *Id.*; 21 C. J. 1119, 1161; 10 R. C. L. 692. But "mere silence will not work an estoppel" (10 R. C. L. 692), and the principle does not apply where one stands by and sees another laying out money upon property to which he has some claim or title without giving

notice of it, where the structure or other improvement is a mere encroachment on land the title to which is equally open to both parties. *Casey v. Inloes,* 1 Gill, 430; *Schaidt v. Blaul, supra.* A *fortiori* it does not apply to a case where the person charged with the estoppel was not only under no obligation or duty to speak, but where he had no interest whatever in the land upon which the person claiming the estoppel had made expenditures, and where any protest on his part against such expenditures would have been an officious and futile interference with the right of the improver to do with his own property as he would.

In this case there was no dedication of the one-foot strip by deed or recorded plat, nor the slightest evidence that the appellant by word or act at any time represented to the appellees or any of them that Overbrook Road would abut on their property, and it also appears without contradiction that the outlines of the appellant's property as well as that of the appellees were a matter of public record open to both parties. The appellant had no right, title, or interest in the appellees' property, and in our opinion was under no obligation or duty to advise, warn, or direct them as to how it should be improved, unless the improvement thereof encroached upon its land or violated some right or privilege belonging to it. The appellees assert that "there can be no question in this case that, on the original plat as laid out, the Cityco Realty Company intended to dedicate Overbrook Road for the public use with a width of fifty feet for its entire length. But that statement does not go far enough. It is true that appellant did at first propose to open Overbrook Road fifty feet wide if the Slaysmans would contribute to the expense of opening it. But it does not appear that any plat showing the road fifty feet wide and abutting on the Slaysman land was ever recorded, and, when the Slaysmans refused to contribute to the expense of the improvement, appellant withdrew the offer, as it had a right to do. John H. Slaysman was asked if he had seen the "plats of the Cityco Realty Company," and he said he had, but he was not asked, nor did he testify, as to what plats he had seen, or what the plats he saw indicated, nor was any

recorded plat offered in evidence which showed that part of Overbrook Road which lies south of appellees' property to be fifty feet wide, nor indeed did the appellees buy their property with reference to any plat made by the appellant, nor did they buy their property from it. James K. Vickers, appellant's engineer, said that the first plat prepared by the appellant showed Overbrook Road fifty feet wide south of appellees' land, but it does not appear that that plat was ever recorded, or shown to the appellees or any of them, or that any of them ever saw it, and, while John J. Hurst said he showed Alonzo Slaysman a "plan" showing his land as a corner lot, it did not appear that it was anything more than a provisional plan prepared for appellant's own convenience. Those facts are neither sufficient to show that the appellant dedicated Overbrook Road fifty feet wide south of appellees' land to public use, nor to estop it from preventing the appellees from making any use of the strip inconsistent with its rights as the sole owner thereof.

It is conceded that the appellees, against appellant's protest, have repeatedly trespassed upon the strip, and it may be inferred from the pleadings and the evidence that they have done so under a claim of right, and that they will continue to do so unless restrained by a court of equity. So that the question is, whether a court of equity has the power to enjoin the appellees from further trespassing on appellant's one-foot strip of land. That a court of equity has jurisdiction to restrain a series of independent trespasses where but for such relief the complainant would be forced to resort to a multiplicity of actions at law to protect his property is clear enough (*High on Injunctions,* secs. 697, 702, 702A; *Gilbert v. Arnold,* 30 Md. 37), and especially is that true in this case, where by reason of the size and location of the property it would be difficult, if not impossible, to formulate any measure of damages which would justly compensate the plaintiff. But the appellees suggest that the bill should have been dismissed because "there is not one word of evidence as to the value of the one foot strip of land or of the damages done or which could possibly be done by the trespasses complained

of." That contention rests upon Code, art. 16, sec. 109, which provides that "the courts of equity in this state shall not hear, try, determine or give relief in any cause, matter or thing wherein the original debt or damages does not amount to twenty dollars." There are several answers to that objection: one is that it was not raised in the court below, Code, art. 5, sec. 41; another is that John J. Hurst, a witness for the appellant, testified that land fronting on Sherwood Road was worth twenty dollars a front foot; and finally, where the bill on its face failed to show that the value of the land was below the jurisdiction of the court, it was incumbent upon the defendants, if they proposed to rely upon that fact, to bring it to the attention of the court by some appropriate pleading. 21 *C. J.* 159; *Bradt v. Kirkpatrick,* 7 Paige (N. Y.) 62.

There remains finally the question as to whether a court of equity should exert its extraordinary and drastic powers to protect by injunction a right created and reserved solely for punitive or coercive purposes. The consideration of that question involves the maxim that "he who seeks equity must do equity," which in substance may be taken to mean that, before one is entitled to relief in a court of equity, he must be prepared to concede to his adversary every equitable right which his case entitles him to receive. 20 *C. J.* 174, *Pomeroy, Eq. Jur.,* sec. 385 *et seq.* But in the application of that principle, one cannot assume the very case to be tried, nor refuse the complainant relief upon vague and indefinite notions of the requirements of natural justice, but the equities which the complainant is required to concede must exist in fact and be cognizable in law. In this case it is clear that the appellant retained the strip of land, not for its intrinsic value, or for any use that it might make of it, but to deprive the appellees of any benefit which might accrue to them through the enhanced value of their land if it abutted on Overbrook Road. But in doing that it violated no right of the appellees, for it was using its own land, and it left them in an even better position than they were before the road was opened. For, even though they had no right of access to it,

its mere existence assured them that no building would be erected nearer than fifty feet south of their land, and it afforded them an additional way or avenue in reaching their property by way of Sherwood Road. Nor did the reservation of such a strip between the appellees' land and a public highway violate any requirement of public policy, for the municipal authorities may upon the application of any freeholder widen the road to include the strip, if in their judgment the public convenience requires such action. Balto. Co. Code, sec. 598. Under such circumstances, the appellant, in reserving the one-foot strip, was exercising a clear legal right, which the law is bound to protect, and we know of no legal principle which could justify the refusal of that protection because the appellant, in exercising its rights, was actuated by motives which the court might not approve, especially since the refusal of it would in effect not only deprive the appellant of its property without compensation, but at the same time would grant the beneficial use of it to the appellees. In our opinion, therefore, the appellant's bill of complaint should not have been dismissed, but an injunction should have issued in accordance with its prayer. There was therefore error in the decree of the learned and experienced chancellor who decided the case, and it must be reversed.

> *Decree reversed, and case remanded for further proceedings in accordance with the views expressed in this opinion, with costs to the appellant.*

BOND, C. J., filed a dissenting opinion as follows:

In leaving this one-foot strip of its land beside the highway, unrelated to any usable land which the complainant may still own, the complainant has left itself a property right which it cannot itself enjoy, and has placed its property under the feet of the public and adjacent owners, so to speak, with the result that disregard and violation of the legal interest retained seem inevitable. An injunction would seem

to protect an unsubstantial interest against inevitable disregard. The element of irreparable damage to the complainant, which is necessary to support equitable interference, seems lacking. *Whalen v. Delashmutt,* 59 Md. 250, 254. And prevention by injunction is, by the complainant's arrangement, made difficult, if not impracticable. When it is added that the complainant's purpose, in which the aid of the court is enlisted in this case, is to exact from the adjacent owner a price for freedom from annoyance and inconvenience, it seems to me the court of equity is presented with a strong case for refusal to interfere. My conclusion is that the decree should be affirmed and the bill of complaint dismissed. *Story, Equity Jurisprudence,* secs. 1292 and 1293; 1 *High, Injunctions* (4th Ed.), sec. 723; 2 *Beach, Injunctions,* sec. 1127.