Argued June 19, affirmed September 26, 1951

# BENNETT *v.* CITY OF SALEM ET AL.

235 P. 2d 772

*Chris J. Kowitz* and *Allan G. Carson,* both of Salem, argued the cause for appellants. With them on the brief was John H. Carson, of Salem.

*Frank C. McColloch,* of Portland, argued the cause for respondent. On the brief were Koerner, Young, McColloch & Dezendorf, and John P. Bledsoe, all of Portland.

TOOZE, J.

This is a suit for an injunction, brought by Gardner Bennett, as plaintiff, against the city of Salem, a

municipal corporation, and Carl Guenther, and Floyd L. Siegmund, water master, as defendants, and involves rights to the use of the waters of the North Santiam river in Marion and Linn counties, Oregon. The trial court entered a decree in favor of plaintiff and defendants appeal.

Plaintiff is the owner of a right to divert and use 812 c.f.s. (cubic feet per second) of water from the North Santiam river for power and manufacturing purposes with priority of 1866. He acquired this right from his grandfather, A. D. Gardner, on June 1, 1945. The defendant city of Salem, Oregon Pulp and Paper Company, and Thomas Kay Woolen Mills jointly own a right to divert and use 254 c.f.s. of water from said river for "power and manufacturing" purposes with priority of 1856. The Oregon State Game Commission has the right to divert and use 50 c.f.s. of water from said river with priority superior to all other rights, dating in fact "with the settlement of the country." The defendant city of Salem is also the owner of an additional right to divert and use 22 c.f.s. of water from said river for "municipal use" with priority of July 5, 1923. This litigation is concerned with the exercise of this latter right by the defendant city of Salem.

On April 5, 1938, there was filed in the office of the state engineer an order of the circuit court of Marion county, dated October 26, 1937, wherein it was ordered that, pursuant to the laws of this state, a certain cause then pending in said court be transferred to the state engineer for determination in connection with the determination of all rights to the use of the waters of the North Santiam river and its tributaries. All notices required by law were given by the state engineer, surveys and examinations were made,

and hearings held. Thirty-nine contests were filed with the state engineer in said proceeding. A. D. Gardner, plaintiff's predecessor in interest, was involved in eight of those contests, either as contestant or contestee.

Pursuant to an order of the state engineer, dated February 11, 1941, allowing intervention in said proceedings by persons holding certificates of water right to the use of the waters of the said river and its tributaries, the defendant city of Salem intervened and filed its statement and proof of claim, wherein it asserted the right to the use of 22 c.f.s. of water from said river for municipal purposes, with a priority date of July 5, 1923. This claim by the defendant city was allowed by the state engineer and, together with the other rights hereinabove mentioned, was confirmed and finally determined by a decree of the circuit court of Marion county of date February 1, 1945.

Usually during the summer months of the year, and particularly during the months of August and September, the quantity of water flowing in the North Santiam river is less than the amount awarded to the appropriators mentioned. In the case now before the court, plaintiff contended that after the Oregon State Game Commission has taken its 50 c.f.s. of water, and the city of Salem, Oregon Pulp and Paper Company, and Thomas Kay Woolen Mills have taken their 254 c.f.s. of water, he is entitled to the next 812 c.f.s. of water, or so much thereof as may be available, before the defendant city of Salem has any right to directly divert any water at all for municipal purposes.

The city of Salem owns a water system for the purpose of supplying its inhabitants with water for

fire protection and domestic use. It became the owner of this water system in 1935, pursuant to a charter amendment adopted in December, 1931. At that time, and for many years prior thereto, the Willamette river was the source of the city's water supply. The charter amendment authorized the acquisition of a new source of supply. After a careful investigation by the city's then water commission and other city officials, the North Santiam river was agreed upon as such new source, and it was determined that the water should be acquired through an infiltration system to be installed on Stayton island, a tract of land formed by the separation of the North Santiam river into two channels, known as the North channel and the South channel, for the length of the island. This island lies about two miles upstream from the city of Stayton and some 18 miles from the city of Salem.

The record discloses that the defendant city's attention was first directed to Stayton island by the said A. D. Gardner, and, in the course of the investigation preceding a final determination to locate the infiltration system on said island, Gardner wrote several letters in which he strongly advocated the acquisition of this water supply source. He also appeared personally before certain of the city officials. Gardner was the owner of a part of the island and of certain other lands through which the city would need an easement for the laying of its water line. Most of the investigation here alluded to was carried on in the fall of 1935.

The city thereupon took steps to acquire lands upon Stayton island and rights of way for the pipeline from the island to Salem. Installation was complete by October 1, 1937, at a cost of $900,000 for the infiltration

system on the island and the pipeline, the infiltration system costing $160,000.

The infiltration system adopted by the city was well described by defendant Carl Guenther, manager of the Salem water department. In a system of this type the water is not taken directly from the running stream into a pipeline or settling basin. The water is gathered by means of perforated pipes, which are laid horizontally underground, into a collection chamber, from whence it eventually reaches a conduit leading to the place of use. Some of the water was gathered into the settling basins from three wells the city had made upon the island, each having a depth of 60 feet.

After the new water system was installed on the island, and the delivery of water to the city of Salem commenced about October 1, 1937, it soon became apparent that there were not sufficient percolating or seepage waters underneath the island to supply the demands of the city. Thereupon, an intake, which apparently had been installed upstream from the point of diversion of water by the Gardner appropriation at the same time the other installations were made by the city, was opened during a part of each year, and particularly during the summer months, permitting water to flow directly from the North channel of the North Santiam river over and upon the filter beds of the city on Stayton island. The amount of water so diverted varied from time to time, but it was agreed between the parties at the time of trial that 10.47 c.f.s. of water, which was the actual diversion on August 26, 1946, represented the amount directly diverted daily from the river onto the filter beds.

This direct diversion of water by the city is the bone of contention in this litigation; it is the diversion

which plaintiff seeks to enjoin. He prays an injunction to restrain the city from making such diversion in times of water shortage and mandatory injunction directing the state engineer and the water master to close the intake valve at the point of this diversion whenever less than 812 c.f.s. of water enters the head of the diversion works of plaintiff.

As a part of a stipulation entered into between the parties prior to trial, the defendant city admitted that it has, since 1938, at times when there was insufficient water in the stream to supply plaintiff's earlier priority of 812 c.f.s. of water, diverted water for municipal use from the running stream through said 18-inch intake valve situated above plaintiff's diversion works, permitting the water thus diverted to flow to a point on Stayton island where it percolates through the underground infiltration system into the transmission pipeline of the City of Salem for use by its inhabitants, and that it intends to continue this practice unless restrained by order of the court.

By its amended answer the city defends on two grounds: (1) That plaintiff is estopped by certain acts and conduct of A. D. Gardner, his predecessor in interest, from denying the city the right to so divert the water; and (2) that the laches of plaintiff and his predecessor in interest prevents recovery. At the trial, over plaintiff's objection, a third defense to the effect that plaintiff is guilty of wasteful use of the water was urged by the city, though not pleaded.

In his reply plaintiff pleaded the proceedings wherein the relative water rights hereinabove mentioned were determined, the intervention of the defendant city of Salem therein, and the failure of the city in that proceeding to assert or claim that Gardner

was estopped to assert priority of right against the city, or that he had been guilty of laches.

As a part of its decree of February 1, 1945, the circuit court of Marion county decreed as follows:

"4. * * * At any and every time when the flow of said stream at the City's point of diversion on the north shore of Stayton Island falls below an amount equal to the sum of—

"(a) the amount necessary to supply the right adjudicated in the Adjudication Decree to the State Game Commission for fishway, which amount shall always be 50 cu. ft. per second plus

"(b) such amount as may be necessary to supply the adjudicated rights of the Salem Power Right [city of Salem, Oregon Pulp and Paper Company, and Thomas Kay Woolen Mills] for power and other manufacturing purposes, but never to exceed 254 cu. ft. per second plus

"(c) such amount as may be necessary to supply the adjudicated rights of the Plaintiff for power and other manufacturing purposes, but never to exceed 812 cu. ft. per second

the Water Master shall assume control of the division of the waters of said stream in that locality by adjusting, setting or closing, as the case may be, all headgates, valves or other diversion works as may be necessary, and shall divide, regulate and control the division of the waters of the stream in accordance with the relative priorities herein stated * * *.

"5. The Defendant City of Salem and the Defendant Carl Guenther, and all other officers, employes * * * of said Defendant City of Salem * * * are from and after October 1, 1949, unless otherwise ordered by the Court, hereby permanently restrained, enjoined and inhibited from directly diverting from the running stream of the North Santiam River more than 22 cubic feet per second at any time for municipal use, and from diverting

any water whatsoever for municipal use through its said 18″ intake valve on Stayton Island or through any other direct diversion facilities whatsoever at any time when to do so would leave insufficient water in said stream to supply said adjudicated prior needs and requirements of the Plaintiff.''

As their first assignment of error defendants assert that the lower court erred in enjoining defendants in that the suit should have been dismissed on the plea of equitable estoppel.

This claim of estoppel is based largely upon certain letters written by A. D. Gardner in which he advocated the use of Stayton island as the location of the defendant city's new water infiltration system and also voiced the opinion that there would be ample water for all the needs of the city. He also suggested methods of construction of such system.

All of the suggestions made and opinions expressed by Gardner had to do with obtaining water by an infiltration process on Stayton island, the development of an underground source of supply from underground waters. At no time did he suggest or contemplate that the city make direct appropriation from the running stream. To the contrary, he warned the city that he and the Salem Power Right used all of the natural flow of the stream during the dry seasons; that the natural flow was muddy and unpalatable; and that in order to get "pure, wholesome water," *they must go underground and seek it.* The record discloses that before reaching its final determination to construct this infiltration system on Stayton island, the city caused an investigation and report to be made by engineers of its own selection, with several of its officials making their own independent investigation.

■ To constitute an equitable estoppel, or estoppel by conduct, (1) there must be a false representation; (2) it must be made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; and (5) the other party must have been induced to act upon it. *State v. Claypool,* 145 Or. 615, 28 P. 2d 882; *Bramwell v. Rowland,* 123 Or. 33, 261 P. 57; *Oregon v. Portland Gen. Elec. Co.,* 52 Or. 502, 528, 95 P. 722, 98 P. 160; 31 C.J.S., Estoppel, 254, § 67.

■ At no place in the record does it appear that defendants at any time claimed that Gardner was guilty of fraudulent conduct; on the contrary, they admitted that he had no intent to defraud. We have examined the record with care, particularly the Gardner letters in question, and we do not find anything therein to sustain the defense of estoppel. At most Gardner's statements respecting the amount of water available from a Stayton island installation of the type advocated were mere expressions of opinion. There was an attempt made by defendants to establish the proposition that they relied upon what Gardner said. The attempt was abortive, but even had the evidence disclosed such reliance, it would have been of no avail, because, considering the nature of the statements made and the other circumstances of the case, defendants had no right to rely thereon. To have done so would have been to shut their eyes to obvious facts; it would have been a gross act of negligence on their part. But the evidence in the record abundantly establishes the fact that defendants actually relied upon their own investigation in finally determining to install the system as and where they did. There is no evidence in the

542

record which establishes even one of the essential elements of estoppel by conduct, let alone all of them as is necessary before the defense may stand.

■ Furthermore, in the adjudication proceedings terminating in the decree of the circuit court for Marion county under date of February 1, 1945, and hereinabove referred to, defendants had the right to set up their claim of estoppel in their contest of plaintiff's claim therein. All the facts existed then which are now claimed as the basis of defendants' defense herein. The issue there involved, as does the issue here, the use of the waters of the North Santiam river. Such a claim as defendants urge here was necessarily involved in the issues of that proceeding. If an estoppel existed, it was the duty of defendants to plead and prove it there. The doctrine of res adjudicata applies not only to what is actually litigated in a proceeding, but also to all matters within the issues of the case which could and should have been litigated. The rule is stated in 50 C.J.S., Judgments, 193, § 716, as follows:

> "The judgment is conclusive of all matters properly belonging to the subject of the controversy and within the scope of the issues, so that each party must make the most of his case or defense, bringing forward all his facts, grounds, reasons, or evidence in support of it, on pain of being barred from showing such omitted matters in a subsequent suit; and even if the second cause of action is different, if the second action involves a right, title, or interest as to which the judgment on the first action is a conclusive adjudication the estoppel must extend to every matter which might have been urged to sustain or defeat that right, title, or interest."

See also *First Nat. Bank of Burns v. Buckland,* 130 Or. 364, 280 P. 331; *Lloyd-Garretson Co. v. Marvin*

& *Co.,* 128 Or. 191, 274 P. 128; *Spence v. Hull,* 75 Or. 267, 146 P. 95, 146 P. 98; *Yuen Suey v. Fleshman,* 65 Or. 606, 133 P. 803; *Neil v. Tolman,* 12 Or. 289, 7 P. 103; *Barrett v. Failing,* 8 Or. 152.

■ This court has directly held that the circuit court in an adjudication of water rights under the water code is a court of general jurisdiction, and its decrees are res adjudicata and conclusive upon the parties and their privies. *Tudor v. Jaca et al.,* 178 Or. 126, 139, 164 P. 2d 680, 165 P. 2d 770. In the adjudication proceedings defendants did not plead nor seek to prove an estoppel as claimed here, but they are barred from making the claim here to the same extent as though it had been expressly raised and determined in that suit.

As their second assignment of error defendants urge upon us the proposition that the trial court erred in allowing an injunction, because it is claimed plaintiff had slept on his rights and was guilty of laches.

■ We find no merit in this contention. The proceedings for the adjudication of water rights in the North Santiam river commenced in 1937. They were not terminated until February 1, 1945. During that period of time plaintiff's predecessor in interest was involved in eight contests concerned with his claim to 1,100 c.f.s. of water of said river, finally allowed to the extent of 812 c.f.s. Defendant city participated in at least two of these contests. During the years of this pending litigation plaintiff's predecessor in interest did not know what his actual rights were. He was in no position to commence a suit such as that now before the court until the respective rights of himself and the city were finally determined by decree of the court.

At the time of the entry of the decree on February 1, 1945, A. D. Gardner was an aged man and in such poor mental and physical condition as to be unable to transact ordinary business. On June 1, 1945, plaintiff became the owner of the Gardner water right. He immediately commenced construction of improvements to his diversion system and forthwith objected to the actions of defendant city in directly diverting water from the running stream during the dry months of the year when there was a shortage. He filed this suit on September 19, 1946. There is nothing whatever in the record which indicates that defendants were in the slightest degree injured by such delay as did occur in the commencement of the instant litigation. They certainly were not deprived of any evidence on account thereof. *Montgomery v. Anglo-Calif. Trust Co.*, 157 Or. 187, 68 P. 2d 1057. The trial court correctly decided the question of laches.

As a third assignment of error defendants maintain that the trial court erred in not denying relief to plaintiff upon the theory that plaintiff did not come into court with clean hands.

■■ This contention is based upon a claim that the evidence showed plaintiff and his predecessor in interest to have been guilty of an unreasonable wastage of water. Unquestionably, an appropriator of water is not entitled to unreasonably waste it. What he appropriates must be devoted to a beneficial use, and he is never entitled to divert more water than is actually put to such use, reasonable transmission losses excepted. *In re Water Rights of Deschutes River*, 148 Or. 389, 36 P. 2d 585; *Broughton v. Stricklin*, 146 Or. 259, 277, 28 P. 2d 219, 30 P. 2d 332; *In re Waters of Umatilla River*, 88 Or. 376, 168 P. 922, 172 P. 97; § 116-437, O.C.L.A.

Defendants presented evidence to support their contention that the canals and other facilities of plaintiff were old and in a state of disrepair; that unreasonable leakages occurred at the dams and at the structures utilizing the water; and that losses were noticeable along plaintiff's diversion canal. There was a dispute in the testimony respecting these claims, and evidence was offered on the part of plaintiff that he had expended approximately $50,000 in improvements and repairs and proposed to make further improvements.

Whether the diversion system in use by plaintiff and his predecessor in interest was in a bad state of repair, and by reason thereof there was an unreasonable wastage of water, should have been determined in the adjudication proceedings. The facts urged here to support such claimed wastage existed before and during the pendency of those proceedings. This court has held that all unreasonable wasting of water should be suppressed by the court in adjudicating water rights. *In re Water Rights of Deschutes River,* supra. It is an issue involved in every suit of that type. Defendants made no such claim in the adjudication proceedings as they make here. They are barred from making it here for defensive purposes.

■ Further, under the express provisions of the statutes of this state, the water master is charged with the duty of preventing wastage of water, and this is a continuing duty. § 116-303, O.C.L.A. If there is any unreasonable waste of water by plaintiff in connection with his use of the amount of water awarded to him by the decree of the circuit court, it is the duty of the water master to stop it. *Broughton v. Stricklin,* supra.

■ Moreover, there are two additional reasons why this contention of defendants lacks merit. In the first place, there is a dispute in the testimony with re-

spect to the alleged wastage of water by plaintiff, and the evidence offered by defendants to sustain their claim in that regard is exceptionally weak and unsatisfactory. The trial court correctly decided the factual issue against defendants. In the second place, and perhaps more important, all this evidence was wholly irrelevant and immaterial to any issue in the case. The defendants did not plead this alleged waste as an affirmative defense. They contend that the evidence was admissible under their general denial. We cannot agree with them. Such a defense, if at all material in this suit, is new matter and, to be available to defendants, should have been pleaded. Under the issues as framed by the pleadings, plaintiff had no notice whatever that he would be called upon to meet such a charge of wrongdoing. His first notice came during the course of the actual trial when the evidence was offered. It is obvious that such an attack at that time would take him by surprise, and it came at such a late date as to render it impossible for him to fully prepare to meet the charge. It is for just such reasons as these that the law requires such defenses to be affirmatively pleaded if they are to be available to defendants.

Finally, defendants contend that an injunction should not issue because it will seriously affect the public; that it might deprive an entire community of sufficient water for municipal use.

 We agree with defendants that injunction is an extraordinary remedy, and it should not be granted except upon clear and convincing proof. *DeArmond et al. v. Moon et al.*, 123 Or. 28, 32, 260 P. 1100. We also agree that there are situations where the public interest would be so seriously affected by the issuance of an injunction that the court will deny an application therefor. Each case depends entirely upon its own

peculiar facts and circumstances. But the instant case is not such a one as demands or justifies an application of such a rule.

Here, we are dealing with a municipal corporation engaged in business for profit in its proprietary capacity, as distinguished from its governmental capacity. It has admitted acts which constitute trespasses upon the rights of plaintiff and proposes to continue such trespassing unless restrained. The amount of water it is wrongfully diverting at the expense of plaintiff, when figured in gallons per day, is very substantial. It is manifest that plaintiff is being damaged by such unlawful diversions, though it would be extremely difficult, if not impossible, to measure that damage in dollars and cents. Plaintiff does not seek damages in this suit; he simply asks that defendants' wrongful acts be restrained.

We have held in many cases that a municipal corporation when operating a municipal works for profit is acting in a proprietary capacity and is subject to all the penalties and disabilities in connection therewith that are imposed upon private persons or corporations engaged in a similar activity. For example, see *Butler v. City of McMinnville*, 126 Or. 56, 268 P. 760.

We know of no rule of law or equity, nor has any been called to our attention, that would give to a city engaged in business for profit the right to ignore with impunity or trample upon the lawful rights of another, as the defendant city has been and is doing in this case.

The defendants are guilty of repeated trespasses. Equity should and will intervene to prevent a continuance thereof. The decree of the circuit court is affirmed. Plaintiff is entitled to costs and disbursements.