456 P.2d 385

W. W. JARVIS, for and on behalf of himself and other persons or legal entities constituting a class too numerous to be named as parties, Petitioners,

v.

The STATE LAND DEPARTMENT; Obed M. Lassen, State Land Commissioner; CITY OF TUCSON, a municipal corporation, real party in interest, Respondent.

No. 9488.

Supreme Court of Arizona.

In Banc.

June 24, 1969.

Rehearing Denied July 15, 1969.

Elmer C. Coker, Phoenix, Cox & Johnson, Eloy, for petitioners.

Gary K. Nelson, Atty. Gen., by Dale R. Shumway, Sp. Asst. Atty. Gen., Phoenix, for Obed M. Lassen, State Land Commissioner of Arizona.

Dino De Concini, City Atty., of Tucson, Robert O. Lesher, Sp. Asst. City Atty., Tucson, for real party in interest.

Jennings, Strouss, Salmon & Trask, Phoenix, for amici curiae, Salt River Project Agricultural Imp. & Power Dist. and Salt River Valley Water Users Ass'n.

STRUCKMEYER, Justice.

This petition for an injunction filed December 12, 1968, invokes the original jurisdiction of this court, Constitution of Arizona, Art. VI, Sec. V, A.R.S. It is by W. W. Jarvis on behalf of himself and others who irrigate 33,000 acres of land in the Avra and Altar Valleys by means of wells pumping percolating waters. The action is directed principally against the City of Tucson, a municipal corporation which has recently drilled certain wells in the Avra and Altar Valleys and proposes to transport the waters pumped therefrom across state lands to Tucson, a distance of some fifteen to eighteen miles. Respondents, the State Land Department and the State Land Commissioner, Obed M. Lassen, admit that the withdrawal and transportation of water by Tucson will reduce the supply of ground water (percolating water) in the valleys and requests this court to determine the legality of Tucson's actions. Petitioners ask that the State Land Department and State Land Commissioner be required to cancel any existing grants of rights-of-way over state lands by which Tucson may transport water and that the State Land Department and the State Land Commissioner be enjoined from permitting Tucson to transport water through a pipeline over state lands. A resume of the law as it has developed in the Arizona cases controlling the use of ground waters will point up the principles governing this case.

■ Thirty-seven years ago in Maricopa County Municipal Water District, et al. v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369, rehearing denied, 39 Ariz. 367, 7 P.2d 254, this court predicted that the time would soon come when it would be necessary to consider the extent of the rights of the surface owners to the water flowing or

lying beneath the soil. That day arrived twenty-one years later in 1952. In the first decision in Bristor v. Cheatham, 73 Ariz. 228, 240 P.2d 185, a majority of this court held that in Arizona the doctrine of prior appropriation applied to the use of ground water. The doctrine was bitterly assailed on rehearing and the court then in deciding that the owners of the land had a vested property right in the water underlying unequivocally committed this state to the doctrine of reasonable use rather than prior appropriation. Bristor v. Cheatham, 75 Ariz. 227, 255 P.2d 173. The rule that the owner of land owns the water beneath the soil has been the continuous holding of this court for seventy-five years. Howard v. Perrin, 8 Ariz. 347, 76 P. 460; McKenzie v. Moore, 20 Ariz. 1, 176 P. 568; Maricopa County Municipal Water Dist. et al. v. Southwest Cotton Co., supra; Bristor v. Cheatham, supra; State ex rel. Morrison v. Anway, 87 Ariz. 206, 349 P.2d 774.

In Bristor v. Cheatham the plaintiffs were the owners of wells on their lands which supplied water for domestic purposes. The defendants, many years later, sank a number of large wells for irrigation purposes. They transported the water thus pumped a distance of approximately three miles for the development and irrigation of lands not previously cultivated. It was expressly stated in the decision that the water was not beneficially used on the lands on which the wells were located. The defendants' pumping caused the water level to drop to the extent that the plaintiffs were deprived of water for domestic purposes. In the second decision this court considered both the English and American rules on reasonable use and adopted the American quoting from Rothrauff v. Sinking Spring Water Co., 339 Pa. 129, 14 A.2d 87, 90, as follows:

" 'While there is some difference of opinion as to what should be regarded as a reasonable use of subterranean waters, the modern decisions are fairly harmonious in holding that a property owner may not concentrate such waters and convey them *off his land* if the springs or wells

of another land owner are thereby damaged or impaired. * * *.' " (Emphasis supplied). 75 Ariz. at 236, 255 P.2d at 178.

In the instant case Tucson admits in its response that it has acquired well sites and drilled wells for the purpose of transporting water for the municipal uses of its residents. Tucson denies that petitioners will be irreparably injured and damaged by the withdrawal and transportation of ground waters from the Avra and Altar Valleys, asserting that its proposed pipeline system is designed to carry at a low head pressure 24,000,000 gallons per day and that its maximum capacity will be approximately 30,000,000 gallons per day. The denial by Tucson that petitioners will be irreparably injured and damaged must, therefore, be tested by whether petitioners' water supply will be impaired by the transportation of water from the lands overlying the well sites which Tucson has acquired.

In 1948 the Eighteenth Legislature in its Sixth Special Session recognized that there were limits to the water resources of the state and adopted a Ground Water Code, See A.R.S. § 45–301 et seq. Procedures were established by which the State Land Department would designate critical ground water areas in which thereafter the construction of other irrigation wells was prohibited. We upheld the constitutionality of the Code in 1955 in Southwest Engineering Co. v. Ernst, 79 Ariz. 403, 291 P.2d 764. There we said:

"The legislative finding that the exhaustion of ground water by excessive withdrawals threatens to destroy one of the principal economic resources of the state to the consequential serious injury of all is not disputed. Such a conclusion is obviously justified because unrestrained use must inevitably result either in complete exhaustion of the state's ground water so that in the end the lands dependent thereon will revert to their desert state or in the lowering of water tables so that the increased cost of pumping will reduce these lands to a marginal or submarginal condition." 79

Ariz. at 408–409, 291 P.2d at 768. [Footnote omitted]

In 1954, pursuant to the terms of the Ground Water Code, the Avra and Altar Valleys were declared critical, being included within and as a part of the Marana Critical Ground Water Area. This is an official act of a state agency, the records of which we take judicial notice. State ex rel. Smith v. Bohannan, 101 Ariz. 520, 421 P.2d 877. That these lands are within a Critical Ground Water Area is alone sufficient to grant petitioners the relief sought since a Critical Ground Water Area is a ground water basin or a subdivision thereof "not having sufficient ground water to provide a reasonably safe supply for irrigation of the cultivated lands in the basin at the then current rates of withdrawal." A.R.S. § 45–301. Manifestly, a ground water area or subdivision of a basin which does not have a reasonable safe supply for the existing users can only be but further impaired by the addition of other users or uses.

Petitioners have also supported their position by filing with this court as an exhibit the "Ground Water-Resources Report No. 25 of the Arizona State Land Department" published in February of 1966. From that report entitled "An Appraisal of Ground Water-Resources of Avra and Altar Valleys, Pima County, Arizona", it appears that in common with the Basin and Range Province of the Western United States, the Avra and Altar Valleys form a north-south trending ground water area bounded on the east and west by mountains of igneous and strongly metamorphic rock. The Altar Valley is to the south and considerably smaller than the Avra Valley into which its waters discharge. The floor of both valleys consists of alluvium, a conglomerate of silt, sand and pebbles washed in by erosion from the surrounding mountains to a depth in places of at least 2,000 feet. The detrital material below the valley floors permits the storage of a large volume of water which runs off from the mountain area and "probably infiltrates to the ground water reservoir through the coarse materials at the base of the mountains and along the stream channels." Ground Water-Resources Report No. 25, supra, page 14.

There is not sufficient data to determine the theoretical available reservoir storage or the rate of withdrawal with relation thereto in the Altar Valley, but it is clear that its underground drainage is into the Avra Valley. In the Avra Valley the water storage has been determined to be about 16.5 million acre feet above an arbitrary depth of 1,000 feet below the surface of the ground. Statistics supplied from wells in the Avra Valley for a ten year period from the spring of 1955 to the spring of 1965, establish that about 1.2 million acre feet of ground water were withdrawn for an average of 120,000 acre feet annually. After considering the small amount of natural inflow in excess of the natural outflow, this withdrawal in ten years has amounted to about fifteen per cent of the storage capacity of that portion of the reservoir underlying the Avra Valley and has resulted in the lowering of the water table by approximately eighteen feet. Long range planning within the Avra-Altar area, is, of course, as elsewhere, based on the proposition that a hydrologic equilibrium must be maintained.

From the foregoing, it is readily apparent that any additional uses must necessarily deplete the source of supply of existing users. The City of Tucson in proposing to establish a system with a potential withdrawal capacity in excess of 30,000,000 gallons per day will be taking more than 30,000 acre feet per year. Hence, Tucson, if permitted to place its proposed system into use, would withdraw and transport from an area that is already critical an amount of water equal to about one-fourth of that presently being consumed with the resulting dimunition and earlier depletion of the existing water supply. Tucson's action is clearly illegal.

It is Tucson's position, however, that petitioners are not entitled to an injunction when the party charged with the withdrawal and transportation of ground water is

a municipal body possessing the power of eminent domain. Tucson urges that equity will not enjoin the doing of an act which will take or injure the property of others when such taking or injury can be justified and compensated under the rules of eminent domain.

■ We said in State v. Anway, supra, that because of the pronouncements in Howard v. Perrin, supra, and Maricopa County Municipal Water District et al. v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369, that the doctrine of reasonable use "* * * is a rule of property, * * *." By Art. 2, § 17 of the Constitution of Arizona "* * * No private property shall be taken or damaged for public or private use without just compensation having first been made, or paid into court for the owner, * * *." We think this language of the Constitution is clear and unambiguous, needs no interpretation and means exactly what it says. Hence, assuming that Tucson can exercise the power of eminent domain to condemn rights in percolating water, a point we do not decide, compensation must be first paid to the petitioners or into court on their behalf.

■ We recognize that line of cases which holds that where damages for the mining of subterranean water can be adequately compensated in a suit for damages, equity will not entertain an injunction. But even were we to ignore the vital thrust of the Constitution, we do not think on the present record that a suit for damages can adequately compensate petitioners. There are admittedly some 33,000 acres of farm land dependent upon the ground water of the Avra-Altar Valleys for productivity. The State of Arizona as owner or trustee of state school lands has 8,000 acres under lease in cultivation. It has an interest in the remainder of the desert lands overlying the Avra-Altar Valleys totaling some 81,000 acres, at least a part of which has not been put into cultivation because of the prohibition contained in the Ground Water Code. To require petitioners and the State of Arizona to now prove damages which may result at some time in the indefinite future when the lands become marginal or wait until the ground water level has so dropped that the lands overlying are no longer productive is unconscionable, harsh, and inequitable. The interests are too great for such a cavalier treatment of the rights here sought to be preserved.

■ Respondent, Tucson, asserts that courts will not enjoin municipalities from the illegal exploitation of ground waters. We assume, since no injunction is prayed for against Tucson and since Tucson designates itself in its response as the real party in interest, that its position is predicated on the theory that an injunction against the State Land Department and the State Land Commissioner is in reality an injunction against Tucson. There are cases concerning percolating waters where courts after finding that an action for damages was adequate have refused to issue an injunction against a municipality, but not where, as here, damages are difficult to measure and irreparable. Many courts have found that an injunction is an appropriate remedy. Koch v. Wick (Fla.), 87 So.2d 47; Forbell v. City of New York, 164 N.Y. 522, 58 N.E. 644; Dinger v. City of New York, 42 Misc. 319, 86 N.Y.S. 577; 182 N.Y. 542, 75 N.E. 1129; Township of Hatfield v. Lansdale Municipal Authority, 403 Pa. 113, 168 A.2d 333; Bennett v. City of Salem, 192 Or. 531, 235 P.2d 772.

Tucson urges an estoppel against petitioners alleging:

> "That in March of 1968, attorneys for the petitioners and the City met and conferred, the attorneys for petitioners being then informed of what even before that time were widely-known plans; that the City hearing no complaint, proceeded to enter into contracts and agreements with the United States and others to spend at least 2.8 million dollars on construction between March, 1968, and the filing of this petition; [December 22, 1968] * * * and that they [petitioners] have done nothing to assert their purported rights and are now estopped to do so; * * *."

▮ We do not think these allegations raise an estoppel. Petitioners were sufficiently concerned to engage attorneys to meet and confer with Tucson. Thereafter, the legal rights were as apparent to Tucson as to petitioners. Silence does not operate as an estoppel where the means of knowledge is equally available to both parties. Cityco Realty Co. v. Slaysman, 160 Md. 357, 153 A. 278, 76 A.L.R. 296; Anno. 304, 310. Estoppel by silence cannot be invoked by one who knows the true character of his own title. Certainly, petitioners were under no duty to protect Tucson by advising it as to what its legal rights were. To make the silence of a party operate as an estoppel, there must have been a duty to speak. Ray v. First National Bank of Arizona, 88 Ariz. 337, 356 P.2d 691. Remaining passive and silent does not deprive a person of his legal rights. In addition there must be some act to induce or encourage another to alter his position. Grant County Deposit Bank v. Greene, 6 Cir., 200 F.2d 835.

For the foregoing reasons a mandatory injunction will issue directing the State Land Department and Obed M. Lassen, State Land Commissioner, to cancel any rights-of-way heretofore granted to Tucson for the transportation of water between the Avra and Altar Valleys and Tucson, and the State Land Department and State Land Commissioner are perpetually enjoined from granting such rights-of-way except upon the following condition: that upon application to this court, accompanied by a showing that the Avra-Altar Valleys are no longer critical within the meaning of the Ground Water Code of 1948, or such other circumstances as would permit the legal pumping and transportation of ground water therefrom, this injunction will be modified or dissolved as the facts warrant.

LOCKWOOD, V. C. J., HAYS, Justice, and NABOURS, Judge, concur.

NOTE: The Honorable JESSE A. UDALL, Chief Justice, having disqualified himself, the Honorable WILLIAM W. NABOURS, Judge of the Superior Court of Yuma County, Division 1, was called to participate in his stead.

McFARLAND, Justice (especially concurring):

I concur in the able opinion of Justice Struckmeyer; however, because of the importance of the subject I feel that it is desirable to express my views emphasizing some of my reasons for my concurrence.

The issues involved in the case are set forth in the majority opinion. Also the history of the development of the law is likewise discussed. The people of this State have had for a century a great appreciation of the importance of the proper utilization of the water of our State. The history of its use—dating back a century—has been outlined in the many opinions of the trial court and of this Court, beginning with the Kent Decree in the case of Hurley v. Abbott et al. [See Adams v. Salt River Valley Water Users' Association, 53 Ariz. 374, 89 P.2d 1060.]

The principal cases setting forth the rule governing subterranean waters are given in the majority opinion, beginning with Howard v. Perrin, 8 Ariz. 347, 76 P. 460, holding that percolating waters are the property of the owner of the soil, but the subterranean streams flowing in natural channels between well-defined banks are subject to appropriations under the same rule as surface streams. In the case of Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Company, 39 Ariz. 65, 4 P.2d 369, the late Justice Lockwood outlined the history of subterranean water law, affirmed the holding in Howard v. Perrin, supra, and held that:

"Whether percolating waters in Arizona since the adoption of the Howell Code have been governed by the old English common law in its strictest form, or by the American modification known as the rule of correlative rights, as explained and defined in Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236, 99 Am.St.Rep. 35, and the cases

which follow it, based on the doctrine of *sic utere tuo ut alienum non laedas*, we need not now decide. When the matter is properly before us, we will determine the rule which applies."

In Bristor v. Cheatham, 73 Ariz. 228, 240 P.2d 185, and on rehearing, 75 Ariz. 227, 255 P.2d 173, in the prevailing opinion the Court adopted the American rule that one may extract water for a reasonable, beneficial use of the land from which the same is taken.

The Legislature, in its 6th Special Session in 1948, adopted a ground-water code. This act of the Legislature was, by this Court, in an able land-mark decision authored by Justice Struckmeyer, held to be constitutional. In Southwest Engineering Co. v. Ernst, 79 Ariz. 403, 291 P.2d 764, this Court, in passing upon the ground-water code, held:

"* * * After a groundwater area is designated as critical, the construction of new irrigation wells therein is prohibited with certain exceptions, i. e., domestic and replacement wells. Those who are pumping from existing wells are allowed to continue to the full capacity of such wells. It should be emphasized that in critical areas the Act does not pruport to regulate the use of ground water between owners of land in cultivation, nor does it regulate the use of ground water outside of critical areas with exception that waste as defined is universally prohibited. By prohibiting the drilling of new wells in critical areas, the Act limits the use of water to present facilities thereby preventing additional withdrawals from underground supplies which are determined to be inadequate.

\* \* \* \* \* \*

"It can thus be seen that a conflict occurs between appellant and the state by reason of the interest of the public in the preservation from destruction of a resource essential to the sustenance of life. Where the public interest is thus significantly involved, the preferment of that interest over the property interest of the individual even to the extent of its destruction is a distinguishing characteristic of the exercise of the police power. The principle which we recognize here as controlling rests upon historic precedent extending back into the common law, Respublica v. Sparhawk, 1 Dall. 357, 1 L.Ed. 174, Bowditch v. City of Boston, 101 U.S. 16, 25 L.Ed. 980, and has had continuous recognition almost to the present moment. United States v. Caltex (Phillippines), Inc., 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157.

"It has application not alone to the disasters of fire, flood, pestilence and war, but to other circumstances where public interests dictate an unavoidable choice between one class of property as against another."

In the instant case, as set forth in Justice Struckmeyer's opinion, there can be no question but what the pumping of the water by the City of Tucson would deplete the source of supply of the petitioning users. The determination of the rights of the petitioners requires careful consideration of the objectives of the ground-water code.

In addition to those discussed in the Ernst case, supra, I call attention to the fact that what was known was the Central Arizona Project was pending in the United States Congress at that time. The Bureau of Reclamation of the Department of the Interior took the position that the Arizona Water Users in Central Arizona would not be saved by the Central Arizona Project from the disaster which would result from water shortage unless there was an underground water law which would regulate and prevent an expansion of the use of water; that otherwise new land would be put into cultivation which would deplete the water supply even more than what would be gained by the importation of water from the Colorado River. The Governor of Arizona, in compliance with this position, made many recommendations to the Legislature for the adoption of a groundwater code, and called the Legislature back into several sessions for its adoption. These facts are shown by his many mes-

sages to the Legislature. To the 4th Special Session he said:

"It is unnecessary to halt all pumping in the areas that now are using from one and a half to eighteen or twenty times the amount of water available. Our goal should be to endeavor to adopt a program that will spread the remaining water over say ten or twelve years. If we can do this, Arizona will be able to obtain the co-operation of the federal government to bring supplemental water from the Colorado River in sufficient quantity to give every one an adequate supply.

"If we are to obtain this Colorado River water, we must have this legislation. * * *" Journal of the House, 18th Legislature, 4th Spec. Session, p. 11

And, then, in his proclamation calling the 6th Special Session of the 18th Legislature, he said:

"WHEREAS, the regulation and control of Arizona's groundwater resources is an imperative necessity, if this State's rights in the Colorado river are to be realized, the imminent threat to its agricultural industry averted, and the consequent menace to its economy turned aside." Journal of the House, 18th Legislature, 6th Spec. Session, p. 9

Then, in his message to the Legislature, he stated:

"It is too bad that we did not get a code back in 1937 when a legislative study conducted under the direction of the University of Arizona recommended groundwater controls. Our present development would have been more orderly and on a much sounder foundation. But it is useless to deplore past mistakes. We now have opportunity to correct that mistake and at the same time open the door for bringing in water from the Colorado river that should forever end the recurring threats of water shortage that has plagued this area since man arrived. "The proposed code that will be presented to you at this session represents the best thinking of all factions involved in this complicated matter. It has been studied and approved as the minimum that we must have to guarantee to the Bureau of Reclamation that we will have a stable economy for the repayment of costs of the Central Arizona Project. Both the Central Arizona Project Association and the Interstate Stream Commission have endorsed the Bill on that basis." Id., at p. 11

I do not feel that there is any question but what the Legislature was seeking to meet these objectives when it passed the underground water code in 1948. In Chapter 5, Laws of 1948, 6th Special Session, Section 3, the Legislature stated its purpose as follows:

"Sec. 3. *Declaration Of Policy.* United State [sic] Geological Survey reports, based on studies covering a long period of years, indicate that large areas of rich agricultural lands in Arizona are dependent, in whole or in part, upon groundwater basins underlying such lands for their water supply, and that in a number of such basins withdrawals of ground water, greatly in excess of the safe annual yield thereof, is converting the lands of rich farming communities into critical groundwater areas, to the serious injury of the general economy and welfare of the state and its citizens. It is therefore declared to be the public policy of the state, in the interest of the agricultural stability, general economy and welfare of the state and its citizens to conserve and protect the water resources of the state from destruction, and for that purpose to provide reasonable regulations for the designation and establishment of such critical groundwater areas as may now or hereafter exist within the state."

The act provides for the designation of "certain critical underground areas."

"1. 'Critical groundwater area' means any groundwater basin as herein defined [in paragraph 5], or any designated subdivision thereof, not having sufficient ground water to provide a reasonably safe supply for irrigation of the cultivat-

ed lands in the basin at the then current rates of withdrawal."

The question then before this Court is whether the City of Tucson, which is not in the same water basin designated as a critical area as the petitioners, has the right to pump water from that area into another water basin. Unquestionably it was the intent of the Legislature to protect the rights of users within a critical area and thereby prevent the withdrawals threatening to destroy one of the principle resources of the State which could only result in an injury to all. The critical areas were limited to water basins and subdivisions thereof. Then, as now, there were many recognized and established water rights in each water basin. For example, in Adams v. Salt River Valley Waters Users' Association, supra, this Court recognized the right of the S.R.V.W.U. to pump water to supply irrigation not only for the lands from under which they were pumped but from other lands in the Project. So Justice Struckmeyer's decision, I think, rightly limits the question in the instant case to the taking of water from critical areas and transporting it to other areas.

The City of Tucson in its brief cites § 45–301 and § 45–322, A.R.S. It contends that the provisions of these sections do not relate in any way to the extraction of water from land for domestic and industrial uses.

We cannot interpret the provisions of these sections to permit the transportation of water pumped from wells in a critical area to another area for the purposes set forth therein to the detriment of the rights of the users in the critical area. Such an interpretation might permit industries to practically exhaust a water supply in a critical area to the detriment of established rights. Such an interpretation would thereby permit the defeat of the objectives of the Legislature in passing the underground-water code for the protection of the rights of the users and the other objectives set forth in the governor's message to the Legislature. Justice Struckmeyer's de-

cision provide for a mandatory injunction to prohibit the transportation of water out of the critical area to Tucson until the Avra Valley and Altar Valley are no longer critical within the meaning of the ground-water code or such other circumstances that would permit the pumping and transportation of ground water therefrom. It is not likely that the area will be declared to be a non-critical area within the foreseeable future. The other circumstances are not spelled out. I am personally of the opinion that the awarding of damages has certain obvious difficulties. The amount of damages to each user would be difficult to determine. This would require taking into consideration the additional costs of pumping water for a greater depth which could vary in different areas of the district, and from year to year. Also there is the question of the quality of water pumped at a greater depth. This would depend upon too many variables. The City may have several alternatives. For example, the City might buy sufficient amount of agricultural lands in the district now using a like quantity of water and retire them from cultivation. Or at least make some arrangement for non-cultivation until the City of Tucson can secure its fair share of Colorado River water under the Central Arizona Project legislation.